UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RICHARD VAZQUEZ,            )
      Plaintiff          )
                            )
      v.                 )    C.A. No. 10-cv-30136-MAP
                            )
MICHAEL J. ASTRUE,          )
COMMISSIONER, SOCIAL        )
SECURITY ADMINISTRATION,    )
      Defendant          )

### MEMORANDUM AND ORDER REGARDING
### PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
### DEFENDANT'S MOTION TO AFFIRM DECISION OF THE COMMISSIONER
(Dkt. Nos. 8 & 10)

April 25, 2011

PONSOR, D.J.

### I. INTRODUCTION

This action seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff applied for DIB and SSI on August 9, 2007, alleging disability since March 3, 2006, due to depression, post-traumatic stress disorder, anxiety, attention deficit hyperactive disorder, and asthma. Plaintiff's claim was

denied initially on November 27, 2007, and again on appeal on October 15, 2008. (A.R. 82-84.) On October 16, 2009, Plaintiff appeared for a hearing before an administrative law judge ("ALJ"), who denied his claim on January 29, 2010. The ALJ's decision became the final decision of the Commissioner when the Decision Review Board did not complete its review in the allotted time.

Plaintiff now moves for judgment on the pleadings (Dkt. No. 8.), and Defendant moves for an order affirming the decision of the Commissioner (Dkt. No. 10). For the reasons stated below, Plaintiff's motion will be denied, and Defendant's motion will be allowed.

## II. FACTS

A. Work Experience.

At the time of the administrative hearing, Plaintiff was fifty-one years old. (A.R. 289.) He has an eleventh-grade education. (A.R. 289.) His work history includes employment as a toner cartridge factory worker, a sewing worker, a cafeteria assistant, and a janitor. (A.R. 299.)

B. Medical History.

1. Mental Impairments.

On March 11, 2006, Plaintiff was the victim of an assault and battery in which he suffered a blow to the head. (A.R. 170-71.) Later that day Plaintiff presented to the emergency room at Baystate Medical Center with a lump behind his ear. (A.R. 170-71.) A CT scan revealed no evidence of a fracture. (A.R. 173.) Plaintiff was given Motrin and Percocet and was discharged from the hospital. (171-72.)

In July 2006, Plaintiff began receiving counseling at the Center for Psychological and Family Services for depression arising from the March 2006 assault. (A.R. 189.) He complained of nightmares, poor sleep, fear, crying spells, decreased motivation and concentration, suicidal ideation, hypervigilence, and alcohol dependence. (A.R. 185, 189, 192.) He also reported seeing people "vanishing," hearing voices when falling asleep, and feeling like he was being "smothered." (A.R. 185, 191.) Nonetheless, at the time he was observed to be alert, his speech was clear and articulate, and his thoughts were logical and reality-based. (A.R. 192.) Plaintiff was diagnosed with moderate depressive disorder, anxiety disorder not otherwise specified, and alcohol dependence. (A.R. 193.) A diagnosis

3

of post-traumatic stress disorder was ruled out, and Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 55.[1] (A.R. 193.)

Roughly two years later, in June 2008, Plaintiff presented to the Center for Psychological and Family Services and reported experiencing some "bizarre," intrusive thoughts. (A.R. 175.) He was prescribed Abilify, and, in August 2008, it was noted that with the help of this medication Plaintiff was better able to cope with his intrusive thoughts. (A.R. 241.) He was assessed a GAF score of 58, and was once again diagnosed with moderate depressive disorder, anxiety disorder not otherwise specified, and alcohol dependence. (A.R. 241.)

In September 2008, Plaintiff had improved concentration

---

[1] The Global Assessment of Functioning ("GAF") Scale is used to report a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text rev. 2000) (hereinafter "DSM IV"). GAF scores in the 51-60 range indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV 34.

and focus, and he reported that he was reading more difficult books. (A.R. 242.) He also reported sleeping better with lowered caffeine intake. (A.R. 242.) Plaintiff appeared animated and had a normal affect. (A.R. 242.)

In November 2008, Plaintiff reported that, despite getting adequate hours of sleep, he was experiencing "gruesome" nightmares. (A.R. 245.) A month later he underwent a neuropsychological evaluation performed by Dr. Mark Elin. (A.R. 235-39.) Plaintiff stated that he can be "spacey and disconnected" at times and that he occasionally sees people "vanish out of his visual field." (A.R. 235.) Dr. Elin noted that Plaintiff was cooperative, engaged, and established a good working rapport with him. (A.R. 236.) Dr. Elin also observed that Plaintiff was initially anxious with limited eye contact, was mildly confused at times, and became "teary and overwhelmed" during moments of confusion. (A.R. 236.) Dr. Elin noted that Plaintiff showed signs of depression and diagnosed Plaintiff with cognitive and adjustment disorders. (A.R. 238.) He also ruled out post-traumatic stress disorder and assigned Plaintiff a GAF score

of 61.[2]  (A.R. 238.)  Dr. Elin advised Plaintiff that he might benefit from occupational therapy, psychotherapy, counseling services, relaxation therapy, meditation, Yoga, Tai Chi, and a low dose of anti-psychotic medication.  (A.R. 238.)

Plaintiff continued to present to the Center for Psychological and Family Services with symptoms of anxiety throughout 2009.  (A.R. 248-52, 265.)  He continued to experience "violent dreams."  (A.R. 251.)  He also reported reading a lot of suspense and horror novels that he borrowed from the library.  (A.R. 251, 267, 271-72.)  Nonetheless, Plaintiff consistently displayed a cheerful mood, was easily engaged, and was consistently assessed GAF scores of 58.  (A.R. 252, 273.)  Treatment notes from June and July 2009 indicate that Plaintiff was "doing well," had a stable mood, and experienced diminished anxiety.  (A.R. 266-67, 271-72, 274.)

    2.   <u>Physical Impairments</u>.

---

[2] GAF scores in the 61-70 range indicate "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM IV 34.

6

Medical records indicate that Plaintiff has been treated for asthma and allergies since at least 2003. (A.R. 130-47, 253-57, 268.) His medications included Loratadine, Advair disks, Albuterol, and Singulair. (A.R. 133, 136, 140, 146.) Chest x-rays taken in November 2004 and February 2008 revealed that Plaintiff had pulmonary inflation consistent with bronchial asthma, but that he did not have acute pulmonary disease. (A.R. 153-54.)

Plaintiff underwent pulmonary testing at Mercy Medical Center in June 2008. Pulmonary function testing indicated that Plaintiff had a "severe obstructive airway defect with significant reversibility, consistent with bronchial asthma." (A.R. 261.) No restrictive defect was noted and a diffusion study was normal. (A.R. 261.) Plaintiff was diagnosed with shortness of breath. (A.R. 261.)

C. State Agency Assessments.

On October 4, 2007, Dr. Lawrence Langer, a state agency psychologist, reviewed the available medical evidence and completed a mental residual functional capacity ("RFC") assessment. (A.R. 200-02.) Dr. Langer opined that Plaintiff had "moderate" limitations in his ability to (1)

7

understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday/week without interruptions from psychologically based symptoms; (4) get along appropriately with coworkers or peers; and (5) respond appropriately to changes in the work setting. (A.R. 200-01.) He found that Plaintiff was not "markedly limited" in any category. (A.R. 200-01.) Dr. Langer noted that Plaintiff's allegations of feeling withdrawn and having problems with attention, concentration, and memory were supported by the medical records, although Plaintiff "shows improvement in all areas except modification of alcohol intake." (A.R. 202.)

Dr. Langer concluded that Plaintiff could understand and remember simple instructions; carry out two-step instructions and maintain attention for two-hour intervals; get along with coworkers without distracting them; and adapt to minor changes in the workplace. (A.R. 202.)

On November 26, 2007, Dr. Hollis Coblentz, a state agency physician, reviewed the available medical evidence and completed a physical RFC assessment. (A.R. 227-34.)

8

Dr. Coblentz opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; sit, stand and/or walk for about six hours in an eight-hour workday; and work in environments without concentrated exposure to respiratory irritants, such as fumes, odors, dusts, gases, or poor ventilation. (A.R. 227-34.)

D.   Plaintiff's Testimony at Administrative Hearing.

On October 16, 2009, Plaintiff appeared before ALJ Martinelli. Plaintiff testified that he was laid off from work in March 2006, became the victim of an assault shortly thereafter, and never returned to work. (A.R. 289-91.) When asked what prevented him from working, Plaintiff responded, "I just -- I don't know, I get these like intrusive thoughts in my head and stuff like that and I can't concentrate, I don't know, I just can't get, you know . . . ." (A.R. 291.) Plaintiff testified that he underwent psychiatric counseling on a weekly basis, and received psychopharmaceutical treatment every month. (A.R. 293.) He testified that he avoided crowds and going out at night because he was fearful of being attacked. (A.R. 294-95.) He added that he heard voices in his head and saw "shadows."

9

(A.R. 296.) Plaintiff also testified that he had difficulty sleeping, that he had difficulty staying focused and remembering instructions, and that he could not handle stress. (A.R. 294, 298-99.)

In terms of daily activities, Plaintiff reported that he walked his daughter to school and helped his wife with laundry, some meal preparation, and grocery shopping. (A.R. 85-87, 297-98.) Plaintiff testified that he could take the bus by himself and that he "usually" had no problem doing so unless the bus was "really crowded." (A.R. 297.) Although he indicated that he would occasionally get together with his cousin to watch movies, Plaintiff reported that he did not socialize with neighbors or others because his neighborhood was dangerous. (A.R. 88-89.)

With respect to his asthma, Plaintiff testified that he experienced severe asthma attacks once or twice a month. (A.R. 291-92.) Although he generally controlled his condition with an inhaler and a nebulizer,[3] Plaintiff testified that he had required hospital treatment on three

---

[3] A nebulizer is a device used to administer medication in the form of mist into the lungs.

occasions in the past. (A.R. 291-92.) He testified that doctors had advised him to avoid dusty environments, but that he could experience an asthma attack at any time. (A.R. 292.)

E.   Vocational Expert Testimony.

A vocational expert ("VE") testified that Plaintiff was previously employed as a sewing worker, assembler of toner cartridges, cafeteria assistant, and janitor. (A.R. 302-03.) The ALJ asked the VE to opine on the job prospects for an individual of the same age, educational background, and work experience as Plaintiff, and who was restricted to light, indoor work involving no concentrated exposure to dust, fumes, strong odors, or extremes in either temperature or humidity. (A.R. 302-03.) The VE testified that such an individual could perform Plaintiff's past work as an assembler of small products and as a sewing worker. (A.R. 303-04).

Upon further questioning by the ALJ, the VE testified that if the individual was further limited to jobs with "clean" work environments and/or only simple one-to-two step activities (although the ALJ emphasized that the record does

11

not support such limitations), he could still perform prior work as a small products assembler, as well as other jobs as an entry-level electronics worker, and a bottle-label inspector. (A.R. 304-05.) Presented with an added limitation of occasional interaction with coworkers and supervisors and no public interaction, the VE testified that none of the above jobs involved public interaction. (A.R. 306.) The VE further testified that no jobs would be available for an individual who had to leave work early or be absent from work at least two times per month. (A.R. 306-07.)

F. <u>The ALJ's Findings</u>.

At Step One of the disability adjudicative process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 3, 2006, the alleged onset date of his claimed disability. (A.R. 13.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: asthma, allergies, cognitive impairments, depressive and anxiety disorders, and alcohol abuse. (A.R. 13.) At Step Three, the ALJ held that Plaintiff's impairments did not meet or medically equal a listed impairment. (A.R. 13.)

The ALJ then found that Plaintiff had the RFC to perform light, indoor work, that required no concentrated exposure to dust, fumes, strong odors, or temperature or humidity extremes. (A.R. 14.) At Step Four, the ALJ found that Plaintiff could return to his past work as an assembly worker and sewing worker. (A.R. 16.) The ALJ also noted that Plaintiff could still perform other jobs, such as electronics worker and bottle label inspector, even if he were further limited to work in clean environments, involving simple one-to-two step tasks, occasional interaction with coworkers and supervisors, and no interaction with the general public. (A.R. 17.)

### III. DISCUSSION

Plaintiff argues that the ALJ's conclusion as to Plaintiff's RFC is not supported by substantial evidence. For the reasons stated below, this argument is unpersuasive.

A. Standard of Review.

Judicial review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner applied the correct legal standards. Seavey v. Barnhart,

276 F.3d 1, 9 (1st Cir. 2001). The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the administrative law judge. See id. at 10. The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Serv., 647 F.2d 218, 222 (1st Cir. 1981). This is true "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Serv., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B. **Whether the ALJ's Conclusion as to Plaintiff's RFC was Supported by Substantial Evidence**.

As noted, the ALJ determined that Plaintiff had the RFC to perform light, indoor work that required no concentrated

exposure to dust, fumes, strong odors, or temperature or humidity extremes. (A.R. 14.) Plaintiff argues that the ALJ failed to properly account for his mental health limitations in arriving at an RFC.

Although Plaintiff correctly points out that the ALJ's RFC finding does not include any express mental health limitations (apart from limiting Plaintiff to unskilled work), the decision to exclude such limitations was fully supported by the record. During the course of his treatment at the Center for Psychological and Family Services, Plaintiff frequently complained of anxiety, "intrusive thoughts," nightmares, and seeing people "vanishing." (A.R. 185, 245.) However, Plaintiff's treatment providers consistently found that he suffered from only "moderate symptoms" of cognitive impairment, as evidenced by GAF scores in the range of 51 - 60. (A.R. 193, 241, 252, 273.) Post-traumatic stress disorder was ruled out. (A.R. 193.)

Observations by Dr. Mark Elin in December 2008 were consistent with these latter findings. Dr. Elin found that Plaintiff suffered from cognitive and adjustment disorders, but he also ruled out post-traumatic stress disorder and

assigned Plaintiff an even higher GAF score of 61.  (A.R. 238.)

Dr. Lawrence Langer, a state agency psychologist, reached similar conclusions after reviewing Plaintiff's medical records.  Dr. Langer found that, while Plaintiff had some moderate limitations, he was not "markedly limited" in any category.  (A.R. 200-01.)  Dr. Langer further observed that Plaintiff "shows improvement in all areas except modification of alcohol intake."  (A.R. 202.)

Plaintiff's own testimony at his administrative hearing did not contradict these reports; in fact, it offered further support.  He testified that he has intrusive thoughts; has difficulty concentrating; has difficulty handling stress; suffers from anxiety when in large crowds; hears voices; sees shadows; and has difficulty remembering instructions.  (A.R. 289-99.)  Nonetheless, these symptoms do not prevent him from walking his daughter to school, helping his wife with chores around the house, going grocery shopping, or taking the bus.  (A.R. 297-98.)  He also reported that while his symptoms result in general feelings of anxiety, he does not suffer from anxiety attacks.  (A.R.

295.)

Finally, even if the ALJ had found that Plaintiff's mental RFC was subject to significant limitations, such a finding would not have changed the outcome of this case. Upon further questioning by the ALJ, the VE testified that if the individual was limited to jobs with "clean" work environments and only simple one-to-two step activities, he could still perform prior work as a small products assembler, as well as other jobs as an entry-level electronics worker, and a bottle-label inspector. (A.R. 304-05.) Presented with an added limitation of occasional interaction with coworkers and supervisors and no public interaction, the VE testified that none of the above jobs involved public interaction and that, therefore, Plaintiff could perform other jobs even if the ALJ had imposed limitations beyond what the record warranted. (A.R. 306.)

In sum, substantial evidence supported the ALJ's decision not to place further limitations on Plaintiff's mental RFC. Limiting Plaintiff to unskilled work as a small products assembler, which requires "little or no judgment to do simple duties that can be learned on the job in a short

17

period of time," was entirely appropriate based on the record evidence. 20 C.F.R. § 404.1568(a). Accordingly, the Commissioner did not err in denying Plaintiff's claim.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 8) is hereby DENIED, and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No 10) is hereby ALLOWED. The clerk will enter judgment for Defendant. The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge